UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DARLENE LLUVIA PADILLA, | Case No. 23-CV-1596 (PAM/JFD) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| MICHAEL SEGAL, | |
| Respondent. | |

This matter is before the Court on the Petition for Writ of Habeas Corpus filed by Darlene Lluvia Padilla (Dkt. No. 1). The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Ms. Padilla asserts that: (1) the Bureau of Prisons ("BOP") is required to calculate her First Step Act time credits ("FTCs") at a rate of 15 days for every 30 days of successful participation in evidence-based recidivism reduction educational ("EBRR") classes or productive activities ("PA"); (2) the BOP has abrogated its statutory authority under 18 U.S.C. § 3632 because she has not been able to participate in any EBRR or PA programming; (3) the BOP must immediately apply her FTCs to reduce her sentence; and (4) the BOP is failing to house her with reasonable safety due to insufficient correctional officers.[1] (Pet. at 6, 8; Pet'r's Reply at 2, Dkt. No. 13.) The

---

[1] Respondent raises an issue in his response that was not raised in the petition: that the BOP correctly determined Ms. Padilla did not earn time credits at the start of her custody. (Resp't's Resp. at 11, Dkt. No. 10.) In her petition, Ms. Padilla contends that 18 U.S.C. § 3632 provides that she be awarded "15 days [of FTCs] per every 30 days of succes[s]ful

1

Court recommends that Ms. Padilla's first and second claims be denied because they lack merit, that her third claim be denied because it is premature and does not present a "case or controversy" within the meaning of Article III of the Constitution, and that her fourth claim be denied because it cannot be raised in a habeas petition.

## BACKGROUND

Ms. Padilla is confined at the Federal Correctional Institution in Waseca, Minnesota ("FCI Waseca"). (Pet. at 1.) She is serving a 60-month sentence of imprisonment for a conviction of importation of methamphetamine in violation of 21 U.S.C. §§ 952 and 960. (Parrent Decl. Ex. A at 2, Dkt. No. 11-1.) Ms. Padilla's projected statutory release date is May 28, 2026, not including the FTCs she has earned that could be applied later to reduce her sentence, assuming she remains eligible. (*Id.*)

Ms. Padilla has been incarcerated at FCI Waseca since October 17, 2022. (Parrent Ex. A at 2.) Her initial program review occurred on October 17, 2022, and her Prisoner

---

participation in Evidence Based recidivism reducing educational classes programs & productive activities." (Pet. at 6.) In an informal resolution attempt attached as an exhibit to her petition, Ms. Padilla argued that the BOP should award her 15 days of FTCs per 30 days of programming "for the length of time in custody." (Pet. Ex. at 2, Dkt. No. 1-2.) Respondent apparently reads this as a claim by Ms. Padilla that "time in custody" includes time she spent in custody waiting to be transported to FCI Waseca, that is, custody time preceding October 17, 2022, the date she arrived at FCI-Waseca (Parrent Decl., Ex. A at 2). Because pro se habeas petitions must be construed liberally, *see Williams v. Lockhart*, 893 F.2d 191, 193 (8th Cir. 1990), the Court will consider the argument that Ms. Padilla should have started earning FTCs at a rate of 15 days per 30 days of programming while she was in custody awaiting transport to FCI Waseca. Whether she should have started earning FTCs at the commencement of her custody or her first day at FCI Waseca is immaterial, however, because Ms. Padilla was not entitled to earn FTCs at the rate of 15 days per 30 days of programming until her second consecutive low PATTERN score assessment, and that did not occur until May 13, 2023. (Parrent Decl. Ex. G. at 1, Dkt. No. 11-7.)

2

Assessment Tool Targeting Estimated Risk and Needs ("PATTERN") score was "low." (Parrent Decl. Ex. G. at 1.) Ms. Padilla's next risk and needs assessment was on November 14, 2022, and she was deemed a "low" risk for recidivism. (*Id.*) Another risk and needs assessment took place on May 13, 2023, and Ms. Padilla was again deemed a "low" risk for recidivism. (*Id.*)

Ms. Padilla has been on a waitlist or has participated in programming during her incarceration at FCI Waseca. (*See* Parrent Decl. ¶ 9.) At first, she earned FTCs at a rate of 10 days for every 30 days of programming. (Parrent Decl. Ex. G at 1.) That rate was increased to 15 days of FTCs for every 30 days of programming on May 13, 2023, when Ms. Padilla was deemed to have a low risk for recidivism for a second consecutive assessment. (*Id.*) An FTC assessment dated July 1, 2023, reflects that Ms. Padilla had earned 90 FTCs as of that date. (*Id.*)

## ANALYSIS

A court may grant habeas relief under 28 U.S.C. § 2241 to a prisoner who "is in custody in violation of the Constitution or laws or treaties of the United States." A writ of habeas corpus under § 2241 is available to a federal prisoner who does not challenge the legality of her sentence, but challenges instead its execution subsequent to her conviction, *Matheny v. Morrison*, 307 F. 3d 709, 711 (8th Cir. 2002), including the computation of the sentence, *Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973) (petitions seeking "immediate release or a speedier release from . . . confinement" are "the heart of habeas corpus"). All but one of Ms. Padilla's claims concern the computation of her sentence.

### A. The BOP Correctly Determined that Ms. Padilla Was Not Entitled to Earn 15 Days of FTCs Per 30 Days of Programming Until May 13, 2023

The first issue is whether the First Step Act ("FSA") requires the BOP to calculate FTCs at a rate of 15 days per 30 days of programming since the beginning of Ms. Padilla's custody. It does not.

The FSA authorizes the BOP to administer the calculation and application of FTCs. *White v. Fed. Bureau of Prisons*, No. 23-CV-725 (JRT/LIB), 2023 WL 5950805, at *3 (D. Minn. Sept. 13, 2023) ("There is no doubt that Congress has delegated the authority to administer the FSA's time credit provisions to the BOP.") (citing 18 U.S.C. § 3632(d)–(e)). Since the BOP is administering the FSA, the Court turns to the body of law that governs judicial review of administrative agency decision-making to determine whether the BOP is administering the statute correctly. The first question in such an analysis is whether the statutory text is so clear that following the statute is simply a matter of reading. If "Congress has directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), then the Court's inquiry into whether the BOP has followed the statute is straightforward, because the Court simply follows the statutory text. *Id.* But if the text is ambiguous, the Court must defer to the BOP's interpretation of the statute so long as it is a reasonable, "permissible construction." *Id.* at 843.

The FSA provides that a prisoner earns FTCs at a rate of "10 days of time credits for every 30 days of successful participation" in EBRRs or PAs. 18 U.S.C. § 3632(d)(4)(A)(i). In addition, a prisoner "determined by the Bureau of Prisons to be at a

minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful" participation in EBRRs or PAs. *Id*. § 3632(d)(4)(A)(ii). Most of this statutory language is clear. Only the two words "consecutive assessments" are ambiguous, and that issue will be discussed in the next paragraph. Other than that ambiguity, the Court can determine Congress's meaning by reading the words of the text. The Court does not need to refer to the BOP's interpretation. Under the unambiguous language of the statute, to earn a total of 15 days of FTCs for 30 days of programming, an inmate must have her PATTERN score calculated as either "low" or "minimum" at two risk and needs assessments. Even if the text were ambiguous—it is not—the BOP's interpretation of § 3632(d)(4)(A)(ii) is a reasonable, permissible construction of the statute. *See White*, 2023 WL 5950805, at *3; *see also Milch v. Segal*, No. 23-CV-838 (NEB/LIB), 2023 WL 6626591, at *4 (D. Minn. June 15, 2023) ("The BOP has interpreted § 3632(d)(4)(A) consistent with what this Court concludes is required by the plain language of the FSA . . . ."), *R. & R. adopted*, 2023 WL 6623707 (D. Minn. Oct. 11, 2023). The only question remaining for the Court is when Ms. Padilla received her second consecutive "low" assessment.[2]

"Consecutive assessments" is ambiguous because there are two plausible ways of reading those words. One plausible reading is that prisoners begin to earn FTCs at the 15

---

[2]Although Ms. Padilla did not directly raise the issue of interpreting "consecutive assessments" in her petition or reply, making this determination is necessary to resolve the dispute.

5

days per 30 days of programming rate after receiving two low or minimum PATTERN scores: one at the initial determination and one at the subsequent assessment. The competing interpretation, advanced by Respondent, is that prisoners must receive three low or minimum PATTERN scores to begin earning FTCs at the enhanced rate. (Resp't's Resp. at 20.) The first low or minimum PATTERN score counts as the initial "determination," after which the prisoner must maintain a low or minimum score "over 2 consecutive assessments." (*Id*.) Under this approach, the two consecutive assessments must occur after the initial determination. (*Id*.) So long as the BOP's interpretation of the statute is reasonable, the Court must defer to it.

While there is textual support for both readings, the BOP's interpretation that a prisoner begins to earn 15 days of FTCs per 30 days of programming after receiving three "minimum" or "low" pattern scores is reasonable. *See White*, 2023 WL 5950805, at *3, where the court upheld the BOP's interpretation of "consecutive assessments" as reasonable because the statute provides that a prisoner is entitled to the 15 days per 30 of programming rate if "over 2 consecutive assessments, [the prisoner] **has not increased** their risk of recidivism." *Id.* (citing 18 U.S.C. § 3632(d)(4)(A)(ii)) (emphasis in original). Thus, the initial "low" determination cannot be counted because, at that point, there is no benchmark assessment to which the BOP could refer to measure whether a prisoner's risk of recidivism had increased, decreased, or stayed the same. On those grounds, that the petitioner in *White* had not yet received her third minimum or low assessment, the court held that she was not entitled to earn 15 days of FTCs per 30 days of programming. *Id.*

Here, the BOP made its initial determination that Ms. Padilla had a low risk of recidivism on October 17, 2022. (Parrent Ex. G at 1.) She received two consecutive "low" assessments after that, the last occurring on May 13, 2023. (*Id.*) Thus, Ms. Padilla received her second consecutive assessment at which her risk of recidivism did not increase on May 13, 2023, and began earning FTCs at the 15 per 30 days of programming rate on that date, as correctly calculated by the BOP.

### B. Ms. Padilla Is Entitled to Earn FTCs Based on the Number of Days of Successful Programming, Not the Number of Programs

Ms. Padilla suggests that she is entitled to earn FTCs based on the number of programs completed, not the number of days in which she participated in programming. This claim lacks merit.

The FSA provides that a prisoner earns FSA time credits at a rate of "10 days of time credits for every *30 days of successful participation*" in EBRRs or PAs. 18 U.S.C. § 3632(d)(4)(A)(i) (emphasis added). And, if a prisoner receives a "low" or "minimum" risk of recidivism, they "shall earn an additional 5 days of time credits for *every 30 days* of successful" participation in EBRRs or PAs. *Id.* § 3632(d)(4)(A)(ii) (emphasis added). There is no ambiguity here—Ms. Padilla is entitled to earn FTCs based on the number of days of successful programming, not the number of programs completed. *See White*, 2023 WL 5950805, at *2. Further, this Court has previously recommended that Ms. Padilla's preferred interpretation be rejected, and that interpretation has been rejected by other courts as well. *See, e.g.*, *Sisson v. Segal*, No. 23-CV-0548 (NEB/JFD), 2023 WL 6065337, at *2 (D. Minn. Apr. 14, 2023), *R. &. R. accepted*, 2023 WL 6065331 (D. Minn. Sept. 18, 2023);

7

*see also White*, 2023 WL 5950805, at *2 ("Contrary to White's assertion, the language of the FSA does not require the BOP to award prisoners time credits for each program of class completed. Instead, the FSA requires the provision of earned time credits for every 30 days of successful participation in recidivism reduction 'programming or productive activities.'") (quoting 18 U.S.C. § 3632(d)(4)(A)(1))).

It is not clear whether Ms. Padilla has participated in some programming or has only been on waitlists. Ms. Padilla indicates that she has not participated in programming but is receiving FTCs simply for being on waitlists. (Pet'r's Reply at 2.) Respondent's position is vague: "While housed at FCI Waseca, [Ms.] Padilla has been on the waiting list for or has completed EBRR programs and productive activities." (Resp't's Resp. at 9.) Respondent further explains that "the extensive wait lists are likely a result of multiple FCI Waseca inmates participating in a disproportionate amount of EBBRs and PAs under the mistaken notion that they can earn FTCs for each program in which they participate in a 30-day period." (*Id.* at 16.) Generally, the BOP's policy is that an inmate earns the same number of FTCs while on a wait list as in programming, as long as she has not refused to participate in any programming. (Parrent Ex. E at 8.)

Thus, whether Ms. Padilla has participated in programming is immaterial because she has been receiving the same number of FTCs for being on waitlists that she would have received for participating in programming. Ms. Padilla has continuously earned FTCs due to her waitlist status, and thus, her inability to participate in programming has had no effect on her ability to earn FTCs. It is unfortunate that Ms. Padilla has not had the benefit of some of the helpful programming she seeks. But as far as the FSA is concerned, the BOP

8

has met its statutory obligation by placing Ms. Padilla on a waitlist to receive programming, which has allowed her to continuously earn FTCs beginning on her first day at FCI Waseca. (Parrent Ex. G at 1.)

### C. The BOP Is Not Required to Apply Ms. Padilla's FTCs to Reduce Her Sentence Until Her FTCs Equal the Remainder of Her Sentence

Ms. Padilla asks the Court to require the BOP to apply her time credits. The Court cannot do so at this time for two reasons: (1) Ms. Padilla has not earned enough FTCs to equal the remainder of her sentence; and (2) her FTCs are not fixed, and she could later lose FTCs through disciplinary infractions. That means this claim is premature under Article III of the Constitution.

Article III of the Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. One characteristic of a "case or controversy" is that it is "ripe," or ready for adjudication. *See Poe v. Ullman*, 367 U.S. 497, 504 (1961); *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000). The ripeness doctrine is meant to avoid having courts decide merely "hypothetical or abstract" disputes that have not yet "ripened" into "a dispute definite or concrete." *Neb. Pub. Power*, 234 F.3d at 1038 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The ripeness doctrine is rooted not only in Article III's limitation of federal court jurisdiction to cases or controversies, but also in "prudential considerations for refusing to exercise jurisdiction." *Id*. at 1037. In the context of a case like this one, in which a litigant asks a court to scrutinize an act of a federal agency, the doctrine's essential purpose "is to prevent the courts, through avoidance of premature adjudication, from

entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The FSA provides that FTCs "shall be applied toward time in prelease custody or supervised release" and that the BOP "shall transfer *eligible* prisoners, as determined under section 3624(g), into prelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added). An eligible prisoner is one who "has earned time credits . . . *in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment*." 18 U.S.C. § 3624(g)(1)(A) (emphasis added). Since Ms. Padilla's 90 days of FTCs fall well short of the remaining two and a half years left of her sentence, the BOP is prohibited from applying her FTCs to reduce her sentence at this time.

Further, as Respondent correctly points out, Ms. Padilla's FTCs are not set in stone. The FSA delegates authority to the BOP to "develop guidelines for the reduction of rewards and incentives" for disciplinary infractions. 18 U.S.C. § 3632(e). The BOP has done so, and "an inmate may lose earned FSA Time Credits for violation of the requirements or rules of an EBRR Program or PA." 28 C.F.R. § 523.43(a); *see also* 28 C.F.R. § 541.3 Table 1 (listing prohibited acts).

Because Ms. Padilla has not earned enough FTCs to trigger the BOP's statutory obligation to apply her credits, and because she could possibly lose credits through disciplinary infractions, this claim has not yet ripened into a "definite or concrete" dispute

10

that could be permissibly resolved by the federal courts under Article III of the Constitution.[3] *See Neb. Pub. Power*, 234 F.3d at 1038; U.S. Const. art. III, § 2.

### D. Ms. Padilla's Conditions of Confinement Claim Cannot Be Resolved Through a Petition for Habeas Corpus

In her reply, Ms. Padilla raises a new issue that was not raised in her petition—that the BOP is failing to house her with reasonable safety due to there being too few correctional officers at FCI Waseca. (Pet'r's Reply at 2.) Not only can new issues not ordinarily be raised for the first time in a reply, but the Court also notes that a challenge to the conditions of confinement cannot be brought in a habeas petition. *See Henny v. Segal*, No. 23-CV-2259 (PJS/ECW), 2023 WL 6164298, at *2 (D. Minn. Aug. 23, 2023), *R. & R. adopted*, 2023 WL 6163958 (D. Minn. Sept. 21, 2023). The Court lacks jurisdiction over this issue.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1. Darlene Padilla's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Dkt. No. 1) be **DENIED**; and

2. Judgment be entered accordingly.

Date: December 11, 2023         *s/ John F. Docherty*
                                JOHN F. DOCHERTY
                                United State Magistrate Judge

---

[3] The Court does not suggest that Ms. Padilla has not *earned* 90 days of FTCs. She has, and she will continue to earn FTCs as long as she meets the eligibility requirements of the FSA. However, her credits cannot be *applied* to reduce her sentence until her FTCs equal the remainder of her sentence.

## NOTICE

**Filing Objections:** The Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed find and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).